## REBECCA L. FOOT *v.* THE ÆTNA LIFE INSURANCE COMPANY.

By the terms of a policy of life insurance it was provided that the proposals, answers and declarations of the assured should be made a part of it " as fully as if they had been therein recited," and it was further declared in the policy that if they should be found *in any respect* false or fraudulent, that then the policy should be null and void. In the series of questions thus annexed to and forming part of the policy, was one propounding the inquiry whether the assured had ever had certain specified diseases, and if so how long, and to what extent, among which were enumerated spitting of blood and diseases of the lungs, to which the assured answered in writing, " No." At the end of the series of questions was a declaration subscribed by the assured, stating that the answers given were correct and true, and that the statements made by him should *form the basis of the contract* of insurance, and also that any untrue or fraudulent answer or any suppression of facts in regard to his health should render the policy null and void. The insurance was effected in January, 1867. It appeared that in November, 1865, he had a slight hemorrhage which lasted on and off for two days. That in March, 1866, he had another hemorrhage, which lasted nearly *ten* days, during which he raised blood twice a day—morning and evening—and was from the effects of this hemorrhage confined to his bed several weeks, and it was about a month before he was able to go out in the open air. That during the first hemorrhage he spit blood more than ten times, and that he thought the spitting of blood during both attacks came from his lungs. He

Foot v. The Ætna Life Insurance Company.

had another attack of hemorrhage in August, 1868, and in September, 1869, died of consumption; *Held*, that the answer of the assured that he had never had a disease of the lungs or spitting of blood was untrue, and avoided the policy.

In an application previously made for an insurance upon his life to another company, the assured had made known to the agent of that company (who was the medical examiner in this application) that he had had two attacks of spitting of blood; *Held*, that this did not change the effect of the untrue answer.

The answers were warranties, and any one of them being untrue there was a breach of the warranty upon which the insurance was made, and which rendered the policy void.

The judge at the trial charged that the answers were warranties to some extent, and if any answer was untrue and was *known to be untrue* at the time it was made, the warranty was broken, and the policy was vitiated; *Held*, that this was error.

The provision in the policy that if the answers, &c. should be found in any respect false or fraudulent, the policy should be void, was not a waiver or merger of the previous provisions in respect to the truth of the answers, nor prevent them from being warranties.

To prove the falsity of a statement it is not necessary to prove that it was knowingly or intentionally false.

APPEAL by defendants from a judgment entered on the verdict of a jury. The facts are stated in the opinion.

*T. R. Strong*, for appellants.

*R. E. & T. Foot* and *James Emott*, for respondent.

BY THE COURT.*—DALY, CH. J.—A new trial would have to be granted in this case upon several grounds. It is not necessary now to recapitulate them, as we expressed our views very fully upon the argument, and it will suffice now to state one ground that is fatal to the plaintiff's action.

By the terms of the policy, the proposals, answers and declarations of Major Foot were made a part of it " as fully as if they had been therein recited," and it was further declared in the policy, that if they should be found, *in any respect*, false or fraudulent, that the policy should be null and void.

In the series of written questions thus annexed to and form-

---

* Present, DALY, CH. J., ROBINSON and LARREMORE, JJ.

ing a part of the policy was one propounding the inquiry whether he had ever had certain specified diseases, and if so, how long and to what extent, among which were enumerated spitting of blood and diseases of the lungs; to which Major Foot answered, in writing, "No." At the end of the series of questions was a declaration, subscribed by him, stating that the answers given were correct and true, and that the statements made by him should *form the basis of the contract* of insurance, and also that any untrue *or* fraudulent answer, or any suppression of facts, in regard to his health, should render the policy null and void.

The insurance was effected in January, 1867, and it was shown, upon the trial, that he was wounded twice while in the army, that on his passage from New York to California, in November, 1865, he had a slight hemorrhage which lasted, "on and off," for two days, and, upon his arrival at Aspinwall, had to be carried on a stretcher from the steamer, to be carried in a like manner from the cars at Panama to the steamer on the Pacific side, and was not able to go with his company to Arizona. That in March, 1866, he had a hemorrhage at his barracks in California, which lasted nearly ten days, during which time he *raised blood* twice a day, morning and evening, and was, from effects of the hemorrhage, confined to his bed several weeks, and it was about a month before he was able to go out in the open air. That during the first hemorrhage he spit blood more than ten times; that in his opinion it came from his lungs, and that he did not recover entirely from the attack before he had the second attack. That the spitting of blood, during the second attack, lasted about ten days, that he was confined to his bed about a month, that he thought the spitting of blood proceeded from his lungs, that he had a cough before the first attack, a cough for *two* years after the second attack, and that the second attack was much more severe than the first. It further appeared, that he had another attack of hemorrhage in August, 1868, and that in September, 1869, he died of the disease of consumption.

This evidence, which was uncontradicted, shows that his answer, that he had never had a disease of the lungs, or spitting of

blood, was untrue. It established that he had had a severe attack of spitting of blood within ten months of the time when the insurance was effected, which had been preceded by a prior attack. Indeed, the evidence showed conclusively that he had had a disease of the lungs before the insurance, and as he had a cough for two years after, another attack of spitting of blood six months after, and as he died of consumption within three years after, the probability is a strong one, that his lungs were diseased at the time that he effected the insurance, whatever his own impression or belief in the matter may have been.

From his own account of the attacks he had had, he could not answer truthfully that he had never had the disease of spitting of blood or any disease of the lungs, and good faith required, when the inquiry was propounded to him, either an answer in the affirmative or a statement of what had occurred. In *Beach* v. *Ingalls*, 14 Mees. & Wels. 95, where a similar inquiry was propounded to the insured, and answered by him in the negative, Chief Baron Pollock said, " one single act of spitting of blood would be sufficient to put the insurers on inquiry as to the cause of it, and ought, therefore, to be stated." In this case, it appeared that the insured, four years before he obtained the policy, had spit blood and subsequently exhibited other symptoms usual in consumptive subjects, and died of consumption three years after the execution of the policy. The judge at the trial told the jury, that it was for them to say, whether he had, at the time of making his statement, such a spitting of blood, &c., as would have a tendency to shorten life, and a new trial was granted upon the ground that the insured, upon such an inquiry, was bound to make known the fact that he had spit blood. " If a man had spit blood from his lungs," said Rolfe B., " no matter in how small a quantity, or even had spit blood from an ulcerated sore throat, he would be bound to state it," which is going much farther than the facts in the present case call for.

Nor does it at all affect this case that Major Foot, in an application previously made for an insurance upon his life to another company, made known to the agent of that company,

Foot v. The Ætna Life Insurance Co.

who was the medical examiner in the present application, that he had had two attacks of spitting of blood. The medical examiner in the present case, Dr. Buehler, was not authorized by the defendants to effect insurances for them; nor did he assume to do so. The defendants had an agent of their own at Harrisburgh, where Major Foot then was. Dr. Buehler was the agent then for another company in which Major Foot had obtained an insurance upon his life, and as he wished to have an insurance in different companies, Dr. Buehler simply recommended the defendants' company. He made out Major Foot's application to the defendants, and signed the certificate of a medical examination by him, but he made the application for him to the defendants through their agent at Harrisburgh, to whom he submitted the application, and from whom he received the policy for Major Foot. Dr. Buehler testified distinctly that he did not act as the agent either of the defendants or of Major Foot. That he made the application for him at his request, to oblige him. That he was not agent for the defendants at any time, nor for any purpose. That he was paid by the defendants his fee for the medical examination, and would have been, whether the application was successful or not. That he knew, at the time of the examination for the present application, of the two attacks of spitting of blood, but he says, "I overlooked it." As he was not an agent authorized to effect the insurance, what he may have overlooked, whether intentionally or through forgetfulness, can in no way affect the defendants. They were not bound by what he might say or omit to say. The application for the insurance was in a prescribed form. Twenty-five questions had to be answered by the applicant for the insurance, in writing, distinct from and independent of fifteen questions which had to be answered by the medical examiner, and it was not for Dr. Buehler, but for the defendants or their agent in Harrisburgh, to say, when the application with the answers were laid before them, whether the risk would be taken or not. Dr. Buehler testified that he read the questions distinctly to Major Foot, and wrote down the answers as he gave them to him. That he seemed to understand each question, and answered appropriately. That he (Buehler) read the declaration,

before referred to, distinctly to him, and that he signed the application. The policy was issued upon the basis of the written statement and the answers given by Major Foot to the inquiries propounded to him; and this being the case, the policy would be defeated, the answer being untrue in respect to the spitting of the blood and disease of the lungs, even if Dr. Buehler had been an agent of the defendants for procuring an insurance, and knew that Major Foot had had spitting of the blood, unless the doctor, in addition to being an agent to procure application, was also authorized by the defendants to agree with Major Foot for a policy ( *Vose* v. *The Eagle Life Ins. Co.* 6 Cush. R. 42).

The answers were warranties; and the answers referred to being untrue, there was a breach of the warranty upon which the insurance was made, and which rendered the policy void (*Jennings* v. *Chenango Mutual Ins. Co.* 2 Den. 75; *Chaffee* v. *The Catteraugus Co. Mutual Ins. Co.* 18 N. Y. 376; *Brown* v. *Same*, Id. 385 ; *Chase* v. *Hamilton Ins. Co.* 20 N. Y. 52; *Le Roy* v. *The Market Fire Ins. Co.* 39 Id. 90; 1 Phillips on Insurance, c. 7, § 16).

Judgment reversed.

Upon a reargument, the following opinion was delivered.

By the Court.*—Robinson, J.—Upon reargument allowed, some additional considerations have been presented, with earnestness, by the eminent counsel for the plaintiff, whereby he has endeavored, upon the facts presented in the case, to rescue the memory of a beloved son from reflections upon his conduct contained in the statement of facts, or the conclusions therefrom, in the opinion of the Chief Justice (in which all the members then composing the court, including myself, concurred), as warranted by the testimony; and also to show error of the court in entertaining on appeal matters which ought to be solely regarded on a case previously submitted and decided on the judge's minutes, or at special term, as distinguished from mere *exceptions* arising on matters of law heard on a direct appeal.

---

* Present, Daly, Ch. J., Robinson and Larremore, JJ.

The recitals of facts contained in that opinion, showing the particulars of the attack of spitting of blood, from hemorrhage of the lungs, which the assured had suffered in the fall of 1865 and spring of 1866, was derived from his own testimony (taken provisionally, for perpetuation under the statute); and the assumed injustice in the previous opinion is alleged to consist in allusion to his statement in his answers made in January, 1867, upon the faith of which the insurance on his life was made, in which it is stated that "he could not answer truthfully that he never had the disease of spitting of blood, or any disease of the lungs; and good faith required, when the inquiry was propounded, either an answer in the affirmative, or a statement of what had occurred."

A perusal of the case can lead to no other conclusion. In answer to the question (No. 11), "if he had ever had (among others enumerated) the disease of spitting of blood, consumption or disease of the lungs?" he answered, "No;" and to the 13th question, if, during the last seven years, he had "any severe disease?" he also answered, "No." And these patent and uncontradicted facts, recited as from his own testimony, present the merits of this controversy, upon the truth or falsity of these answers.

On his examination, as a witness, in answer to the inquiry, "Did you ever spit blood prior to the time of the issuing of the policy on your life by the Ætna Insurance Company?" Answer: "Yes, when I had the hemorrhages." Question: "How many times did you spit blood?" Answer: "I cannot answer that question, not knowing the difference between hemorrhages and spitting of blood; but if the former, *twice;*" and during the first attack of hemorrhage, he says he spit blood over ten times; also, in conversation with Dr. Buehler, the certifying physician in reference to such application, he says he told the doctor about his hemorrhages, and said, "he did not think he could get his life insured." The benefit of any doubts as to his ingenuousness and good faith founded on *his belief* that he had recovered from his hemorrhages, and that they would not occur again, has been fully accorded in the verdict of the jury on the question submitted to them, as to whether he had *knowingly* had any of the diseases specified in the 11th question, which they have answered in the negative.

Assuming, as is claimed, that the matters in review on this appeal were merely such as were cognizable under a strict bill of exceptions, and that the verdict of the jury could not be disturbed but for error in law, there are such errors in the ruling, of the judge, to which exceptions were taken, as call for a reversal of the judgment.

First, the contract of insurance expressly adopted the proposals, answers, and declarations, which were declared to be part and parcel of the policy, as fully as if therein recited, and that upon the faith thereof the agreement was made, *and that if they should be found in any respect false or fraudulent, then the policy was to be void.*

The learned counsel for the plaintiff contends, that notwithstanding this adoption of the proposal, &c., as the basis of the contract, yet this latter provision (*italicised*) controlled as to any causes rendering the agreement void, and that no defense existed in the fact that any representation was merely untrue, unless it was also "false or fraudulent," and that under the charge of the judge, the jury having found in plaintiff's favor, the verdict ought not to be disturbed upon any considerations that might otherwise be urged upon a case made and motion thereon for a new trial for general error.

In view of the testimony of the assured, as above referred to, there can be little doubt but that the jury have rendered their verdict out of consideration for the public character and virtues of the assured, and his loss of life from wounds or injuries sustained in the service of his country, rather than upon the question of the entire truthfulness of his representations. There was, undoubtedly, much to extenuate his statements, from his conviction he had that he would recover, and that his hemorrhages would not again occur; but none for his failure to disclose the previous hemorrhages from his lungs.

The express adoption of the proposal, answers, and declarations as part and parcel of the contract and the basis upon which it was made, constituted them in law *express warranties* in respect to the matters therein represented (*Kelsey* v. *Universal Life Ins. Co.* 35 Conn. 225; *Miles* v. *Conn. Mut. Life Ins. Co.* 3 Gray, 580; *Burritt* v. *Saratoga Mut. Life Ins.*

*Co.* 5 Hill, 188; *Murdoch* v. *Chenango Co. Mut. Life Ins. Co.* 2 N. Y. 210; *Mut. Life Ins. Co.* v. *Wager*, 27 Barb. 365; *Campbell* v. *N. E. Life Ins. Co.* 98 Mass. 381), and "a misstatement in a *warranty* is therefore fatal to the contract, although arising *from the most innocent mistake*, or from *false information*, or from *mere inadvertence*, and as much so as if made with the most wilfully fraudulent intent" (Bliss on Life Ins. § 37, and cases cited in notes).

The judge refused to charge as requested, that if the answers were untrue, the warranty was broken, and that invalidated the policy; but only charged that they were warranties, *to some extent*, and if any answer was untrue, and *was known* to be untrue at the time it was made, the warranty was broken, and that vitiated the policy. The refusal to charge as requested was error, as also was his limitation of the effect of the untrue representation to its having been *knowingly* made. The force of a warranty rests upon *its substantial truth*, and not upon the warrantor's knowledge or belief in its verity (see authorities above cited). But it is further claimed, on the part of the plaintiff, that by the true construction of this agreement, the force or effect of the proposal, answers, and declarations as warranties, was waived or merged in the subsequent provision constituting as sole cause for avoidance of the contract "*if found in any respect*" false or *fraudulent*.

I do not think such construction can be given to this instrument. As already observed, this stipulation as to the proposal, declaration and answers constituted an *express warranty*, and the additional provision as to their being "false or fraudulent," was inserted out of abundance of caution, to cover any other possible case of false suggestion, suppression of the truth, or other fraudulent purpose. Had there been any inconsistency in this respect, the well-known rule of construction applies, that in agreements "*inter partes*" the earlier clauses should prevail (2 Pars. on Cont. 26).

But were this otherwise, the judge erred in holding, even in respect to a representation, that either to constitute a breach of warranty or to be "false," the defendant was bound to show that the statement was "knowingly" or "intentionally made."

As warranties, being *untrue*, they were clearly broken, but to be "false or fraudulent," other elements were required.   To be "false" it was necessary to show further, that they were material in inducing the defendants to enter into the contract. In the present case the materiality of the answer to the 11th and 13th questions cannot be doubted.   The contract itself discloses an intentional variance in the use of the terms "false or fraudulent," and no such distinction can be attributed to them unless regard be had to the ordinary acceptation of the word "false" as referring to a matter untrue, in some *essential* particular, without regard to the knowledge or motive of the person making the representation, who is chargeable with a "*fraudulent*" design, only when he acts *intentionally*.   This distinction between a *false* and *fraudulent* representation is well taken in numerous cases.

In *Alston* v. *Mech.'s Mut. Ins. Co.* (4 Hill, 334), Chancellor Walworth says: "And if the representation be *false* in any material point, even through mistake, it will avoid the policy." In *Carpenter* v. *Am. Ins. Co.* (1 Story, 62), Judge Story says: "A *false* representation of a material fact is, according to well-settled principles, sufficient to avoid a policy of insurance underwritten on faith thereof, whether the *false* representation be by mistake or design."   In *The Mut. Life Ins. Co.* v. *Wager* (27 Barb. 365), the court, Sutherland, J., says: "A false representation will avoid a policy if the actual risk was greater than it would have been, had the representation been true.   In such action it would not have been necessary for the insurers to show that the misrepresentation or concealment was *intentional* or fraudulent."

*Kerr on Fraud and Mistake* (Am. ed. 57) says: "If a man make a representation in the honest belief that it is true, and there is reasonable ground for such belief, a fraudulent intent will not be imputed to him, although it may turn out to be *false*, unless there be a duty cast on him to know the truth."

In *Bennett* v. *Judson* (21 N. Y. 238) the Court of Appeals have held more broadly, "that one, who, without the knowledge of its truth or falsity, makes a material misrepresentation is guilty of fraud as much as if he knew it to be untrue."

Foot v. The Ætna Life Insurance Co.

And see 1 Story Eq. Ju. § 193 ; *Wall* v. *Howard Ins. Co:* (14 Barb. 383). And so if one swear to a fact, without *actual* knowledge, "then it is legal *false swearing*" (*Carroll* v. *Charter Oak Ins. Co.* 10 Abb. Pr. N. S. 175); although what he swears to may prove in fact to be true (Russ. on Crimes, 1753 ; *Commonwealth* v. *Cornish,* 6 Binn. 249).

While in respect to a *warranty* no recovery can be had, unless the representation is substantially true, because such is the exaction of the contract, yet, to defeat a recovery upon a contract by reason of a "*false*" representation, it must be shown not only untrue but material to the risk, although it be immaterial whether it was innocently made or not, and to maintain it as "*fraudulent,*" it must not only be untrue and material, but must have been made with *intent* to deceive or defraud, and actually relied on.

The judge erred in not giving due weight to these considerations, which went to the very merits of the action.

The proposal, answers and declarations being regarded as strict warranties, there was error in overruling the several objections for irrelevancy taken in various instances, against the admission of testimony tending merely to relieve the assured from the imputation of bad faith, and also in the admission of testimony in various other respects, which it is unnecessary to particularize at length, as the foregoing propositions are radical, and preclude the plaintiff, upon the testimony of the assured, from any recovery.

In my opinion the judgment should be reversed, and judgment absolute should be rendered in favor of the defendants.

Judgment reversed.