## WALL and others *vs.* THE HOWARD INSURANCE COMPANY.

No mere representation, made by a party insured, is a warranty. To constitute a warranty, it must be contained in the policy; or if contained in another instrument, it must be made part of the policy, by the agreement contained in the policy.

Thus the proposals and conditions usually annexed to the printed policy are by its express terms to be used and resorted to to explain the rights of the parties; and a compliance with them is as essential on the part of the insured as if they were written in the body of the policy.

But a mere reference to another paper—as a survey, or an application—does not make it part of the policy, nor bind the insured by its contents as by a warranty.

A warranty must be complied with, in all respects, even in those that do not seem to affect the risk.

A representation which is false will avoid the policy if the actual risk is greater than it would be were the representation true. And *it seems* that this is so, even if the misrepresentation was honestly made.

But a misrepresentation in a matter that does not affect the risk or the amount of the premium will not avoid the policy, unless made with an actually fraudulent design.

The reference made in the old fashioned policies still used in the city of New-York, to the proposals and conditions, does not make the application of the insured a warranty; although in the mutual policies the application is by their express terms made part of the policy, and so amounts to a warranty.

Although a warranty must be complied with, even in matters that do not seem to affect the risk, yet the courts are liberal to the assured in giving an interpretation to the warranty; and attach no importance to the printed words, when the written words even impliedly indicate an intention different from the printed. And they have been strict in requiring the insurer, who draws up the policy, and deliberately chooses his own language, to use such words as will, in their literal understanding, clearly convey the intended meaning. *Per* MITCHELL, J.

Where a policy insured parties against damage by fire on their stock as *rope manufacturers*, contained in a brick building; *Held*, that it sanctioned the use by the insured of their stock as rope manufacturers in that building; one of which uses was the manufacture of ropes. And that it would permit the business of a "rope maker," although that was enumerated among the specially hazardous kinds of business, in the policy.

The business of hackling hemp and spinning it into yarn, is distinct from that of making rope; and is not included in a prohibition of the trade of "rope makers," contained in a policy of insurance.

Insurers are assumed to know the usages of trade; and when they use a term having a limited meaning in the trade, and in a policy to one engaged in that trade or in a business closely connected with it, both parties must be

Wall *v.* Howard Insurance Company.

assumed to have understood the term in the sense in which the trade usually understand it.

Evidence of such usage is always admissible.

Where parties applied for insurance upon their stock as rope manufacturers, contained in a brick building *occupied as a storehouse; Held,* that the application was merely a representation, and not a *warranty* that the building was used only as a storehouse.

This action was brought on a policy of insurance dated September 6th, 1843, for four months, upon the plaintiffs' *stock* as *rope manufacturers,* contained in a brick building with tin roof, forty-two feet from their rope walk, at Bushwick. The conditions of the policy required applications for insurance on property out of the city to be made in writing, and to specify the construction and materials, *by whom occupied, whether as a private dwelling or how otherwise,* and whether any manufactory was carried on within or about it. The application in this case was made in writing by the plaintiffs' agent, and described the building as occupied as a storehouse. It was in fact occupied for storing the hemp, and for hackling the same and spinning it into *yarn;* the making of rope from the yarn being done elsewhere. The policy contained a provision that in case the property insured should be used or occupied for the purpose of carrying on any trade or business denominated hazardous or extra-hazardous, or specified in the memorandum of special rates, in the terms and conditions thereto annexed, or for the purpose of storing or keeping any of the articles in the same terms and conditions denominated hazardous, or extra-hazardous, such policy should be void. Among the kinds of business enumerated in the conditions and memorandum of special rates as hazardous, was that of *"rope makers."* The other material facts, and the questions arising at the trial, are stated in the opinion of the court. The plaintiffs recovered a verdict for $2690,27, which the defendants moved to set aside, upon a case.

*J. W. Gerard,* for the plaintiffs.

*Wm. Curtis Noyes,* for the defendants.

Wall *v.* Howard Insurance Company.

*By the Court,* MITCHELL, J. These principles of law are established by the numerous authorities quoted on the argument of this cause and by other acknowledged rules of evidence. That no mere representation made by the insured is a warranty: to constitute a warranty, it must be contained in the policy, or, if contained in another instrument, it must be made part of the policy, by the agreement contained in the policy. Thus the proposals and conditions usually annexed to the printed policy are by its express terms to be used and resorted to to explain the rights of the parties, and a compliance with them is as essential on the part of the insured as if they were written in the body of the policy. The reference made in the old fashioned policies (still prevailing in the city of New-York, and used in this case) to the proposals and conditions, does not make the application of the insured a warranty, although, in the mutual policies prevailing in the rest of the state, the application is by their express terms made part of the policy, and so amounts to a warranty. But a mere reference to another paper, as a survey or an application, does not make it part of the policy, nor bind the insured by its contents, as by a warranty. That a warranty must be complied with in all respects, even in those that do not seem to affect the risk; that a representation which is false will avoid the policy if the actual risk were greater than it would be if the representation were true—and it is said that this is so, even if the misrepresentation were honestly made—but that a misrepresentation in a matter that does not affect the risk or the amount of the premium will not avoid the policy, unless made with an actually fraudulent design.

Although a warranty must be complied with, even in matters that do not seem to affect the risk, yet the courts are liberal to the insured in giving an interpretation to the warranty, and attach no importance to the printed words, when the written words even impliedly indicate an intention different from the printed; and they have been strict in requiring the insurer, who draws up the policy and deliberately chooses his own language, to use such language as will in its literal understanding clearly convey the intended meaning. Thus, where "houses

building or repairing" were included among extra-hazardous occupations, the words were confined to the *trade* of house building or repairing, and the policy attached, although the insured was making very extensive alterations and repairs in the house. So when the character of the building is stated in the policy, every thing is impliedly permitted by the insurer which, is incident to the business that is to be carried on in such a building, or is required for the judicious management and transactions of its authorized operations. Thus, the insurance of a barn sanctioned the use of fire with tar in it, when in the ordinary business of the barn it was necessary to tar the building, and for that purpose fire was brought in, although the policy prohibited fire being kept in the barn; the prohibition being limited by the courts to the habitual use of fire, and not applicable to its occasional use for a temporary purpose connected with the occupation of the premises. So the insurance of "buildings occupied as a china factory and on machinery, stock, &c. finished and unfinished, contained therein," sanctioned the permanent employment of a carpenter in the buildings, notwithstanding the prohibitory clause in the policy; it being proved that by the usage of trade a carpenter was necessarily employed constantly in a china factory. So it has been said, and perhaps held, that if a grocery is insured, every incident to the carrying on of such a business is permitted; and that the prohibition of certain trades impliedly allows all others with all their incidents, and that when buildings were not to be used for the purpose of storing oils and liquors, oils and liquors might be kept in them if not kept strictly on storage, but kept to be sold.

There is reason and necessity for this liberality to the insured; both parties look to the written part of the policy as containing the substance of their agreement. That is prepared by the insurer and in the fewest possible words, and should therefore be considered as allowing all to the insured that either its literal meaning or any fair inference would permit, and in this entirely to control the printed words. This policy insures the plaintiffs against damage by fire on the stock as *rope manufacturers,* contained in the brick building with tin roof. It accordingly

Wall *v.* Howard Insurance Company.

sanctioned the insured in using their stock as rope manufacturers in that building; and one of those uses would be the manufacture of ropes. The insurance was not on the ropes finished, but it designated the character of the stock as that of "rope manufacturers," or from which ropes *were to be made ;* this was done certainly with some design, and there is none more natural than that it was for the purpose of permitting the trade of the rope manufacturer to be carried on there. This would permit there the business of "rope maker," although that is enumerated among the specially hazardous businesses in the policy. But the proof was that this building was used for keeping the stock, and for hackling the hemp and spinning it into *yarn*, and not for the making of the rope ; and that the yarn thus made in this building was taken to another building, there to be made into rope ; and that in the trade the business of a "rope maker" was a distinct business well understood by itself as early as 1832, and meant the making of the rope from the yarn, and not the spinning of the yarn nor the hackling of the hemp ; and although all these branches of the business *might* be carried on by the same person, still the one who twisted the yarn into rope was alone strictly a "rope maker." This being so, the business carried on by the plaintiff in this building, of hackling hemp and spinning yarn, was not included in the prohibition of the trade of "rope makers," contained in the policy, even if the written words did not permit that trade. Insurers are assumed to know the usages of trade, and when they use a term having a limited meaning in the trade, and in a policy to one engaged in that trade, or in a business closely connected with it, both parties must be assumed to have understood the term in the sense in which the trade usually understand it. Evidence of such usage is always admissible.

The building in this case was of brick, with a tin roof ; it had iron shutters in all the basement, and first story and in the second story on the side next to the rope walk, but not in other parts of the building. The plaintiffs had insured at the Williamsburgh Insurance Company, and Mr. Hodges, the secretary of that company, on their behalf, requested Mr. Squires to effect insur-

ance for them with some other company. Hodges said he gave to Squires no description of the building, but referred him to the Contributionship Company who had a survey of it, and that he (Hodges) had no particulars of it to give. Squires says he got the materials for the written application from Hodges, and called on Philips, the secretary of the defendants, who received the application, and asked some questions that he could not answer; but, if his impressions served him right, they were in regard to the standing of the parties, and that Philips then declined the insurance. Squires then informed Hodges (or Post of the same company) that the application was declined for want of knowledge, which he could not communicate, and was requested to return and say to Mr. Philips that Martin of the Contributionship could give all the information requisite; he did so, and Phillips called on Mr. Martin, and says he inquired of him as to the character of the plaintiffs and was satisfied, and effected the policy on the next day. It was a question before the jury whether Mr. Phillips did not see the survey which Martin's company had; he said he did *not recollect* that he saw any survey at that time. It was a fair matter to be passed on by the jury, whether it was not more probable that Mr. Phillips, in the discharge of his duty to his own company, would not have inquired of a company which he knew had insured the same premises, and when it is usual for companies to make and retain a survey, whether they had a survey, and if so to show it to him, than to have done his duty so imperfectly as merely to ask the character of the applicants for insurance. This question was substantially left to the jury, and the conclusion to which they probably came, that Mr. Phillips actually saw the survey, accords with the benign inference of the law, that one is presumed to have done his duty rather than to have neglected it. That survey represents this building as attic, brick and tin storehouse, wood gutter, iron shutters in basement, first story, and a one story brick steam boiler house adjoining or forming part of the building in the rear, and shows also all the neighboring buildings.

The application made by Mr. Squires to the defendants was a mere memorandum, and in the short and careless form not

uncommon in such transactions, with abbreviations and without any stops to aid in the discovery of its meaning.   This is the form, exactly :

"Wall Richardson & Engles wish insurance on their own &c.

Their stock as rope manufactu*res* cont<sup>d</sup> in the brick building with tin roof iron shutters 1st story occupied as a storehouse on the northerly side of and ab<sup>t</sup> 42 feet distant from the rope-walk at Bushwick L. I

<div style="margin-left:3em">

1000 by Guardian

1,000 " Hudson

3,000 " N. Am.

2,000 " East River.

</div>

2000 wanted 4 mo. from this date short rate."

Then added by Phillips, " 2000 from 4 mo<sup>s</sup> for 6 a 50c    $10

<div style="text-align:center">Binding</div>

And in the margin, by whom written is uncertain, " 87½ $5000."

The application is not a contract, nor a part of the contract, but is a representation, and is material only as a defense for the defendants to show that it naturally misled them in a material matter, and so caused them to make an insurance which they would not have made at the rate they agreed to, if they had not been so misled.   It is received therefore as part of the evidence to the jury and not to the court, to show that the defendants did not know the true state of the risk on account of the insured's fault.   And if the jury were satisfied that the survey was seen by the defendants, then they would conclude that they were not misled, either by the supposition that the whole building was occupied as a storehouse, or that iron shutters were to all the windows.   When the application stated that the article to be insured was the plaintiffs' stock as rope *manufacturers* contained in the brick building, &c. it at least intimated that the stock was to be manufactured in that building, so much so at least as to notify the company that the subsequent words " occupied as a storehouse," did not indicate the entire purposes for which the house was occupied; then the words "iron shutters, 1st story," might be considered as stating only that there were iron shutters on the first story.   And if the application is to be read,

"in the brick building with tin roof, iron shutters," it is not a positive statement that all the shutters were of iron; it would still be uncertain whether either party so understood it, and its ambiguity is so striking as to make it probable that an explanation would be sought and given as to its true meaning. The witnesses who probably knew the points of controversy and the true character of the building say, one, (Hodges) "it was brick, tin roof, iron shutters," and another (Knowles) " the basement and upper stories had iron shutters ;" and it is only the survey which limits the extent of these shutters, and that limits them too much : it says "iron shutters in basement, first story." This shows that it would not be safe to regard the use of the words "iron shutters" as necessarily meaning that all the windows of the house had iron shutters, and that it is only a loose memorandum that there are iron shutters in the house. The jury would still be at liberty to determine whether or not that ambiguous language was used to conceal or mislead; and if it was, then to visit it with the just consequences of all attempts at fraud.

Another question for the jury to pass upon in this case, if they should conclude that there was misrepresentation, was whether that misrepresentation was material; in other words, was it such as effected the risk, or the rate of premium. Probably, with a view to this question, the plaintiffs' counsel put the question, "Was 87½ cents a fair rate in September, 1843, for a building like this, and occupied as this was ?" And it was answered very fully ; the witness showing particularly how the building would be charged if not so occupied, and the additions for the extra risks. Mr. Phillips, also, the defendants' witness, stated the current rate of premium for this building occupied as it was, and he said the current rate would be two per cent. On his cross-examination he was asked not an assumed but a supposed case, viz : " If four companies had insured the plaintiffs' buildings at 87½ cents on the $100, knowing the facts, would the current rate have been two per cent a year ?" This was no more than fair on a cross-examination, and in substance was asking him whether, in the case supposed, he would call two per cent the current rate. A like question as to what would be the current

rate of insurance for this building occupied as it was, was also put by the defendants' counsel to Mr. Reading and answered by him. The plaintiffs' counsel, on cross-examination, asked him if four other companies (naming them) had, with knowledge of the facts, insured this property, and charged only 87½ cents, could he say that would not have been the current rate. This was objected to, but was clearly allowable as a means of ascertaining what he had meant by current rate in his direct examination, and what means he had of knowing what the current rate was. The defendant himself put a like question to his own witness.

The rate of premium paid may not be any proof of what risks the insured agreed to run, or in other words, of what the contract actually was ; but in answer to proof of a misrepresentation, it might be shown, that the misrepresentation did not vary the risk, and so that there was a current rate for each of the risks, and that the rate for the actual risk and for that represented was the same. The only objection to this could be that the jury and not the witnesses were to judge of the risk ; but that objection was not presented here, and could not be by the defendants as they introduced this kind of proof, and the plaintiff's was received only to meet their proof.

The court was asked to charge the jury that the application was a *warranty* that the building was only a storehouse. It was a representation and not a warranty, and the question was left to the jury whether the occupation differed in any *material* respect from the representation. The court was next asked to charge that if the application was a representation, it was to be visited with all the consequences of a warranty. This also was wrong ; it would destroy the distinction between a representation and a warranty. The court, as requested, charged that Mr. Squires was not the agent of the defendants, and that the application by him was the application of the plaintiffs. The judge also charged, in substance, according to the fifth request, that if the building was so occupied as to increase the risk beyond the representation, and the defendants did not know how it was occupied, the policy was void. The sixth request was the same in substance, but more specific.

The defendants actually excepted to only that part of the judge's charge which in the printed case is contained in brackets. That, was 1st. That he had intimated his opinion, on the motion for a nonsuit, that the application did not contain any representation of the condition or occupation of the building different from what was proved; but that this was a question for the jury to decide. 2d. That he understood the application to mean that the first story only was used as a storehouse, and then it might be inferred that the other stories were differently occupied; but that also was a question to be decided by the jury. 3d. But if the words, occupied as a storehouse, referred to the whole building, then if the storehouse of a rope manufacturer means a different thing from any other storehouse, and included the use of machinery, there was no misrepresentation. To all this there is but one exception, and in what particular the exception was intended to be taken, is not stated. The first and third parts were clearly right, and that makes the general exception to the whole bad; and properly so, for part being clearly right, the judge at the circuit would be misled by the generality of the exception; he would be certain that the exception was wrong in some respects, and his attention not being directed distinctly to that which might be doubtful, in his charge he would be prevented from correcting his charge as to that part, if there were any error in it. The second part stated the judge's understanding of the meaning of the application, but still left that to the jury. It is impossible to say whether this exception was on account of the judge expressing any opinion on that subject, or for a supposed error in that opinion, or because he left that question to the jury. The exception should have shown what the counsel intended in these respects, that the judge might correct his charge if it should seem to him inaccurate. But that part of the charge was also correct; the question for the jury was whether or not the defendants had been misled by the application; if they believed that the defendants had seen the survey, they would conclude that the defendants were not misled; and where a written paper is produced, not to prove a contract, but to show what was said or represented, and there is other proof to show that the written

Caswell *v.* Bushnell.

words were explained, then the whole must go to the jury together. If one should by writing represent himself to be worth $1000, and at the same time should explain that it was the balance in his favor, after deducting $4000 of debts due by him from $5000 of stock and of debts due to him, the verbal explanation would be admissible in evidence, and the whole would properly be submitted to the jury. If on the other hand he had contracted in writing to pay $1000, no proof could be received that it was at the same time verbally agreed that the payment should be in such a balance. The difference is between a contract and a representation.

As this is a case made with liberty to turn it into a bill of exceptions, the court was also appealed to, to set aside the verdict as against the weight of evidence. The evidence seems to the court to sustain the verdict.

The motion to set aside the verdict is denied, with costs.

[NEW-YORK GENERAL TERM, October 4, 1852. *Edwards, Mitchell* and *Roosevelt,* Justices.]