ALANSON HIGBEE, executor, &c., *vs.* THE GUARDIAN
MUTUAL LIFE INSURANCE COMPANY OF NEW YORK.

An applicant for life insurance having stated to the medical examiner that neither of his parents had, to his knowledge, been afflicted with mental derangement, a non-professional witness, who had formerly lived in the neighborhood of such parents, after describing certain eccentricities of conduct on the part of the mother, was asked, "State whether the things you saw and heard from her struck you as rational, or irrational." *Held* that the question, in the abstract, was admissible, and the exclusion of it error.

Where a physician, examined as a witness, declined, on the ground of want of information, to give any medical opinion as to whether a person's headaches were neuralgic, or proceeded from a disordered stomach; *Held* that it was his medical opinion, alone, which was competent; and that, having declined to give such opinion, it was improper to ask him "what impression was made on your mind?"

In an action upon a policy of life insurance, the widow of the insured was asked what was the condition of her husband's health, up to the time of his death. *Held* that the question was competent, as calling, not for a medical or professional opinion, but for the knowledge and observation of the witness, as matters of fact.

The answer, in such an action, set up as a defence, that the assured falsely represented, in his application, that he had never had any serious illness; *Held,* that, to sustain this allegation of the answer, it was necessary to show that the applicant had had a serious illness; and the language must be understood in its ordinary acceptation. That an inquiry as to serious illness could not be fairly understood to call for a statement that the party had occasionally suffered from a temporary though severe headache.

*Held, also,* that a representation denying the mental derangement of the applicant's parents, not being absolute, but qualified by a reference to his own knowledge on the subject, did not vitiate the policy, although untrue in fact. That even if such statement was to be considered as a warranty, in order to falsify it the proof must show the applicant's knowledge that the same was untrue.

One of the questions asked of the applicant was: "To what extent does the party use tobacco, ales, alcoholic stimulants or opium?" The answer was: "I have never used tobacco in my life, or liquor in any form, and I have never used opium." *Held* that the representation was not rendered false by proof that the applicant had occasionally used alcoholic stimulants, or something in which opium was contained, as a mere medical remedy, when suffering from severe paroxysms of pain.

*Held, also,* that the statement of the applicant, in regard to opium, must be construed to have been an answer to an inquiry whether he used opium as a narcotic stimulant when in an ordinary condition of health, and not as a reply to an inquiry whether he used it in good faith as a medical remedy, during paroxysms of pain arising from occasional attacks of disease.

Higbee *v.* Guardian Mutual Life Ins. Co. of New York.

A warranty is a contract; and to constitute a warranty of fact, in a policy of insurance, it must be incorporated into the contract, either upon the face of it, or by reference.

It was stated in a policy that the same was made " in consideration of the representations made in the application for the same, which is hereby made a part of this policy, and of the sum," &c.  *  *  " And it is also understood and agreed by the within assured, to be the true intent and meaning hereof, that if the representations made in the *application* for this policy and upon the faith of which this policy is issued, should be found in any respect untrue, then and in such case, this policy shall be null and void." *Held* that these provisions clearly made the application a part of the policy itself, and the representations in the answers to the questions contained in it warranties.

*Held, also,* that the " application," referred to in the policy, was a paper headed " Application for policy No. —," and which contained a series of questions intended to be addressed to the person whose life was proposed to be insured; also a paper attached thereto, and headed " Questions to be answered by the party for whose benefit the insurance is desired." That a paper with the heading " Questions to be answered by the medical examiner for the company," was not to be deemed the application, or a part of the application. And that statements made by the applicant to the medical examiner in answer to the questions in that paper, were not warranties, within the meaning of the policy.

When the statement is a warranty, it must be actually true; and whether material or not, its falsity avoids the policy.

The falsity, however, of a collateral representation not expressly warranted by the contract, will not avoid the policy, unless it is material to the risk.  But if false in substance, and material to the risk, there can be no liability upon the policy, however innocently the misrepresentation may have been made.

The judge refused to charge the jury that the statements made by the applicant, to the medical examiner, if untrue, whether intentionally false or not, would vitiate the policy.  *Held* that the request to charge was properly denied, if for no other reason, because it lacked the necessary qualification that the statement must be material.  That the materiality of the statement was a question for the jury; and that, to have instructed the jury according to the request, without qualification, would have been erroneous.

An incorrect statement by the applicant, in answer to a question by the examining physician, will not be deemed such a misrepresentation as to avoid the policy, when it appears that the physician's report as to the applicant's condition, and not the statements of the applicant himself, were relied upon by the company; what the applicant actually did say not being reported to the company.

MOTION for a new trial, by the defendant, on exceptions taken at the Monroe circuit, and ordered to be heard at the General Term in the first instance.

*G. F. Danforth,* for the defendant.

*W. F. Cogswell,* for the plaintiff.

*By the Court,* TALCOTT, J. This is an action on a policy of life insurance procured on his own life by George Mulliner, on the 31st day of December, 1869. Mulliner died on the 20th day of April, 1870, from an overdose of laudanum, taken by him to cure a severe headache. The answer alleged that Mulliner, upon his application for a policy, had made certain specific representations, which at the time he knew to be false, and that the facts so knowingly misrepresented were material to the risk. The exceptions to which our attention is called by the counsel for the defendants are of three classes, namely: Exceptions to the rejection of evidence, an exception to the admission of evidence, and an exception to the charge. These exceptions will be considered in their order.

The first is upon the exclusion of a question put to Dr. Mandeville, who, as a medical examiner for the company, made an examination of the deceased, and a report upon his application. The evidence tended to show that Mulliner had, during his lifetime, been subject, at intervals, to severe headaches, and that on these occasions he had frequently resorted to the use of laudanum as a medical remedy. Among the printed questions to be answered by the medical examiner, was, " Are the functions of the brain, the muscular and nervous systems in a healthy state ?" And the Dr. stated that when he came to this question he asked Mulliner, "Have you ever had any difficulty with your head or brain ?" to which Mulliner answered, "No, never." Another of the printed questions addressed to the medical examiner was, " To what extent does the party use tobacco, ales, or alcoholic stimulants." · And the Dr. states that to this question he added the words " or

opium," and that Mulliner stated, "I suppose I can say
what but few men can say, that you have examined.
I have never used tobacco in my life, or liquor in any
form, and have never used opium, and I have never been
sick a day in my life." Another question to the medi-
cal examiner was, "Has the party ever had any serious
sickness or illness?" and he states that Mulliner an-
swered that question, "No." The Dr. had answered
the printed questions above quoted. The first "yes;"
the second "none; strictly temperate," and the third
in the negative. The final printed question addressed
to the medical examiner was, "Do you advise the tak-
ing of this risk, ten thousand dollars being the maximum
amount?" To this the Dr. answered "yes; for the
maximum amount, a first class subject." The ques-
tions addressed to Dr. Mandeville on the trial, the ex-
clusion of which was excepted to, are as follows: "If
he had informed you that for several years he had been
subject to severe headaches, it would have called upon
you to make further inquiries?" "As a medical man
and professional examiner for insurance, state whether
or not, in your opinion, that was an important fact, if it
existed, to be communicated to you." "State whether,
as a physician and medical examiner for the purpose of
insurance, you would have regarded the use of lauda-
num by Mulliner, if that use had been praticed by him
for a series of years, as important as bearing upon the
answer you would give in regard to the propriety of
taking this risk?" These questions all assumed the
existence of certain facts, to wit, the headaches and the
use of laudanum, of which no evidence had been given
at that time. It does not appear that the counsel then
disclosed the fact that he intended to introduce evidence
to establish the existence of the facts upon which the
opinion of the witness was sought by the questions. As
the case then stood it was impossible for the court to
know that the answers might be rendered relevant by

the subsequent testimony of other witnesses. So far as then appeared or was stated, the questions called for mere abstract speculations wholly irrelevant to the case. The Dr. had already been examined without objection as to the effect which the answers and statements which Mulliner made had on his (the doctor's) mind. These particular questions, the exclusion of which is excepted to, were therefore properly excluded at the stage of the case where the exception appears. And it is therefore unnecessary to criticise them with a view to ascertain whether either of them would have been admissible at a subsequent period.

The next exeception was upon the exclusion of a question put to Horace E. Clark, a non-professional witness. It appeared that Mulliner had stated to Dr. Mandeville that neither of his parents had, to his knowledge, been afflicted with mental derangement. Mr. Clark, who had formerly lived in the neighborhood of the parents of Mulliner, had described certain eccentricities of conduct on the part of Mulliner's mother, such as talking to herself, wandering about, and making contradictory statements. He was then asked "State whether the things you saw and heard from her struck you as rational or irrational?" This court has held, in *Van Zandt* v. *The Mutual Benefit Ins. Co.* (*MS. May Term,* 1872,) following the Court of Appeals in *Clapp* v. *Fullerton,* (34 *N. Y.* 190,) that where the question of sanity is in issue, such a question may be put to a non-professional witness in reference to the conduct and acts of the party whose sanity is under investigation, and which conduct and acts have been observed and are described by the witness. We must therefore consider it in the abstract as admissible, and the exclusion of it error. But it seems to be quite apparent in the case that if technically erroneous, the ruling could not have operated injuriously to the defendant. The defendant wholly failed to establish any such state of known and

Higbee *v.* Guardian Mutual Life Ins. Co. of New York.

recognized insanity as would be within the alleged representation; much less that it was known to Mulliner. To test the question, let us suppose Clark had answered the question that the conduct of Mulliner's mother, which he had described, appeared to him irrational—which is the most the defendant can claim—could it have by possibility made any difference in the result? We think not; for in our view, taking all the evidence together, even with such an answer as is supposed to the excluded question, there would have been no evidence sufficient to warrant a verdict for the defendant in this case upon the ground of the insanity of Mulliner's mother.

The next exception arises upon the exclusion of a question addressed by the defendant's counsel to Dr. Durand. The witness had stated that he had one or more interviews with Mulliner, and had some conversation with him in regard to the headache with which he (Mulliner) was occasionally afflicted. And the counsel for the defendant was seeking to get from the witness an opinion as to whether Mulliner's headaches were neuralgia or proceeded from a disordered stomach. The witness had declined to give any medical opinion; he was then asked by the counsel for the defendant, "Did you get enough" (meaning in the interviews before referred to) "to satisfy your own mind?" The witness answered "I think I did, but not enough to have a medical opinion on." The defendant's counsel then asked him, "What impression was made on your mind?" This question on objection was excluded. It is very clear that the exclusion was proper. It was the medical opinion of the witness which alone was competent. If he declined to give such an opinion, on the ground of the want of sufficient information, that was the end of the matter. His opinion, unless he would undertake to base it upon his professional knowledge, was no more admissible than that of any other man.

The next exception is to the admission of testimony. Mrs. Mulliner, the widow of the assured, was asked by the counsel for the plaintiff, what was the condition of her husband's health up to the time of his death. The question was objected to by the defendant's counsel. And he now insists that it was incompetent, as calling upon the witness for a mere opinion upon a matter as to which she was not an expert. We do not understand that to be the purport of the question. It is one hourly put and answered in the common intercourse of society, to laymen of all conditions, and which it is universally conceded they are competent to answer, not only as to themselves but members of their families. It is understood to call not for a medical or professional opinion, but for the knowledge and observation of the party to whom it is addressed, as matters of fact. Nothing is more common than for a non-professional witness to be permitted to state that at a certain period a party was sick, and the one question no more calls for a medical opinion than the other. Similar questions were held to be proper in the case of *Rawls* v. *The Am. Mutual Life Ins. Co.* (27 *N. Y.* 282,) where it is said by the court: "The witnesses to (of) whom the inquiry was made had known Fish intimately from 1848 down to the period when the policy was obtained, and were competent to testify to his general good health and soundness of constitution," (*case cited p.* 290.) We find therefore no error in the decisions in relation to the rejection or reception of evidence, to which our attention has been called, which requires us to direct a new trial in the case.

The main and important question arises upon the exception to the charge. The court had instructed the jury that for the actual truth of all the answers to the questions contained in the application the insured was responsible, and that if any of these answers were untrue in point of fact, whether wilfully and designedly or fraudulently so, or not, then the policy was avoided.

But in regard to the statements made to Dr. Mandeville the court had charged, in substance, that if Mulliner answered falsely, and wilfully, and intentionally suppressed the truth with the intention of misleading the medical examiner, then also the policy was void. The counsel for the defendant asked the court to charge the jury "that the statments made to Dr. Madeville, if untrue, whether intentionally false, or not, would vitiate the policy." The court refused so to charge, and the defendant excepted. The justice also said in his charge: "I charge you that the gist of the allegation, in this respect against George Mulliner, is fraud on his part, intentional deception of the medical examiner; and if you find that the applicant answered the question truthfully, as he understood it, truthfully as he knew his own case and the peculiarities of his own history, such an answer does not avoid the policy although it may not have been strictly true." To this language, quoting it, the defendant excepted. This part of the charge referred to the answer stated by Dr. Madeville to have been made by Mulliner to the printed question put to the Dr. "Are the functions of the brain, nervous and muscular symptoms in a healty state?" And which the Dr. states he put to Mulliner in the modified form, whether he had any difficulty with his head and brain.

In order to see the application of this charge and refusal to charge to the pleadings and evidence in the case, it is necessary to ascertain what allegations of misrepresentation contained in the answer can be founded upon the statements made to Dr. Mandeville. They are as follows, as set up in the answer: "That he, the said Mulliner, had never had any serious illness. That neither of his parents had been afflicted with mental derangements. That the functions of his brain, his muscular and nervous systems were in a healthy state. That he never used opium in any form." These are the only specifications of false representation which can be

predicated upon the statements claimed to have been made by Mulliner to Dr. Mandeville. The first inquiry is, whether the evidence in the case would have justified the finding that any of these statements were in point of fact false. The interpretation which the answer puts upon the statement made by Mulliner to Dr. Mandeville, if the allegation in the answer is intended to be predicated on any statement made to him in regard to his ever having been sick, is that it was a negative answer to the question put to the doctor: "Has the party ever had any serious illness or injury?" There is no question of any injury. To sustain the allegation of the answer it was necessary to show that Mulliner had had a serious illness. The language must be understood in its ordinary acceptation. Mulliner appears to have been a man of uniformly robust health, except for the occasional headaches from which he had suffered. These headaches, it appeared, continued, generally, but a part of a day, or for a few hours; had never confined him to his bed or in the house, except for such short periods; and the question is, were these serious illnesses within any fair and reasonable interpretation of that expression as it would be understood by ordinary persons. We think the inquiry for serious illness could not be fairly understood to call for a statement that the party had occasionally suffered from a temporary though severe headache; consequently that there was no sufficient proof that the representation alleged in the answer was in fact false. Moreover, whether an illness is "serious" is matter of opinion, about which individuals might differ, and an erroneous opinion on this point stated to the medical examiner will not vitiate a policy. (*Hogle* v. *The Guardian Life Ins. Co.* (4 *Abb. Pr., N. S.*, 346.)

As to the allegation concerning the mental derangement of his mother, we have seen that the representation was not absolute as set up in the answer, but was qualified by reference of Mulliner's own knowledge on the

subject; and even if the statement is to be considered as a warranty, in order to falsify it the proof must show the knowledge of the party that the statement is untrue. (*Bliss on Life Ins.*, § 54.) But, as before stated, the evidence in the case did not warrant the finding of the fact of derangement within the meaning of the representation.

The next allegation claimed to be false is that he represented that the functions of his brain, his muscular and nervous systems, were in a healthy state. It does not appear that Mulliner made any statement to Dr. Mandeville concerning the functions of his brain or his muscular and nervous systems. The interpretation which the defendants put upon what he said about his head and brain is that he substantially answered the question put to the Dr. as to the functions of his brain, in the negative. There does not appear to have been any sufficient evidence, in the case, of any functional disease of the brain; such evidence as there was tends to the contrary conclusion. Dr. Mandeville says that serious functional or organic diseases would ordinarily be inconsistent with such a state of apparent physical health and development as Mulliner presented; that, ordinarily, serious disorder of the brain would not be consistent with the condition in which he found Mulliner's system; and that the state in which he found Mulliner's pulse was evidence, to his mind, that his brain was in a healthy condition. Dr. Clark, who had been called to visit Mulliner professionally on the occasion of one of his headaches, and who states that he made a diagnosis of the disease, says that he formed an opinion that Mulliner's headaches arose from indigestion and derangement of the stomach and bowels; and that those occasional headaches would not necessarily produce organic disease. A function is a peculiar or appointed action; the word is derived from one which signifies to perform. A functional disease of the brain

is some disease of that organ which prevents or inter-feres with the performance of its operation. There does not appear to have been any evidence that Mulliner was afflicted with any disease of the brain which prevented or interfered with the normal operation of that organ.

Another representation alleged to have been false was that concerning the use of opium. The printed ques-tion was, "To what extent does the party use tobacco, ales or alcoholic stimulants?" This question, the Dr. says, he put to Mulliner, adding the words "or opium." The answer of Mulliner was: "I have never used tobacco in my life, or liquor in any form, and I have never used opium." The answer, it will be ob-served, alleges this representation a little broader than it is proved. It states the representation to have been that he never used opium in any form. This statement is alleged to have been false, for the reason that it ap-pears that Mulliner had, on several occasions, resorted to the use of laudanum, as a medical remedy for his headaches. He had also taken Dover's powders for the same purpose. Dover's powders being a well known preparation containing opium as one of its ingredients; and as is proved, on one occasion a solution of morphine was used by Dr. Clark upon Mulliner for the same pur-pose, by subcutaneous injection. Laudanum is in real-ity an alcoholic preparation of opium, known in medical science as the "tincture of opium," but properly known as "laudanum," and very many people have no knowl-edge that the liquid known to them as "laudanum" contains any opium whatever. And it might be a seri-ous question whether the representations alleged should not be strictly construed, and as referring only to the substance commonly known as "opium," the substance which would be understood to be inquired for, and would be furnished by any druggist upon an inquiry for opium. So, too, laudanum contains alcohol, and is undoubtedly, to a certain extent, as a matter of science,

an alcoholic stimulant; but no point is made by the answer on the fact that laudanum contains alcohol. Upon the assumption, however, that the insured guaranteed the entire scientific accuracy of the oral statements made by him to the examining physician, we must ascertain the sense in which the inquiry was put, and what was intended and understood by the parties to the conversation. Tobacco, alcoholic stimulants and opium are all narcotic stimulants; each is occasionally resorted to as a remedy in disease, for the purpose of obtaining the benefit of the narcotic, or stimulating or other properties. Each is also used by numerous persons as a habit, when in health, and for the purpose of obtaining the narcotic and stimulating effects of the drug when the person using it supposes himself to be in the ordinary and normal condition. The use first described, when practiced habitually and to any considerable extent, is considered to be injurious to the health and system, and to have a tendency therefore to shorten life, while the proper administration of either, as a medical remedy, in case of disease, so far from being injurious and tending to shorten life, is used for the very opposite purpose, and is supposed to be curative in its effects. There can be no doubt in what sense this inquiry was intended, or as to which description of use was inquired for; and as little doubt what was understood both by Dr. Mandeville and Mulliner to be the meaning of the question. In fact, Mr. Cole, who acted as agent for the company in receiving the application and effecting the policy, undertaking to state the language of the question put by Dr. Mandeville to Mulliner to have been, "Are you *in the habit* of using tobacco, &c.," showing, at all events, the sense in which the question was understood by him at the time. The answer which Dr. Mandeville made to the question propounded to him by the company was, "None; strictly temperate." Showing that the question, as understood by him, related to what is known and

considered as an intemperate use of the article referred to. To hold that a policy would be avoided, where this usual and proper question had been answered negatively, by proof of the fact that the party had occasionally used alcoholic stimulants, or something in which opium was contained as a mere medical remedy, when suffering from some paroxysm of pain, would render those supposed securities, recently so much relied upon as provisions for widows, orphans and creditors extremely illusory, on the principle of *noscitur a sociis.* (*Harper* v. *Phœnix Ins. Co.*, 19 *Mo.* 506. *S. C. Bigelow's Report of Life Insurance Cases*, 301. *Chattock* v. *Shame*, 1 *Moody & Rob.* 498.) The question as to opium must be understood in the same way as in regard to tobacco and alcoholic stimulants. We are therefore of the opinion that the statement of Mulliner on the subject of opium, must be construed to have been an answer to an inquiry as to whether he used opium as a narcotic stimulant when in an ordinary condition of health, and not as an answer to an inquiry whether he used it in good faith, as a medical remedy during paroxysms of pain arising from occasional attacks of disease. Viewing the question and answer in this light, we do not see that there was any sufficient evidence to establish the falsity of the representation. If we are correct in the foregoing conclusions, that the evidence was insufficient to establish the falsity in fact of any of the representations charged in the answer to have been false, and which can be claimed to have been made by Mulliner to Dr. Mandeville, then what the judge charged or refused to charge as to what would be the effect of those representations if made in good faith, but which were in fact unintentionally untrue, was wholly immaterial, and cannot afford cause for ordering a new trial.

But we do not intend to rest the decision of the motion wholly upon the ground heretofore stated. The representations set up in the answer are alleged with a

*scienter* of the falsity on the part of Mulliner. If these allegations of the answer stood alone, it would perhaps be an answer to the exceptions to the charge and refusal. But in a former part of the answer, referring to these same representations, they are alleged to have been a part of the contract, and to have been warranties, so that for the purposes of the fourth clause of the answer the allegation of the *scienter* was, perhaps, mere surplusage.

Were these oral statements made by Mulliner to the medical examiner warranties, so that they must be absolutely true in all particulars, or the policy is void without regard to their materiality or to the good faith and honest intention with which they were made? A warranty is a contract; and to constitute a warranty of fact, in a policy of insurance, it must be incorporated into the contract, either upon the face of it or by reference. "Courts lean in favor of a construction which makes a given statement a representation rather than a warranty. Warranties will not be created or extended by construction. They must arise, if at all, upon the fair interpretation and clear intendment of the words used by the parties." *Bliss on Life Insurance,* § 53, *and cases cited.*) "A warranty will be strictly·construed as not extending beyond its precise terms." (*Id.* § 54.) "A warranty is never to be created by construction, but must necessarily result from the nature of the contract, or must appear on the face of the policy, or in its body." (*Jefferson Ins. Co.* v. *Cotheal,* 7 *Wend.* 73. See also *Chase* v. *Hamilton Ins. Co.,* 20 *N. Y.* 52; 14 *Barb.* 383; 4 *Hill,* 329.)

In *Eddy Street Foundry* v. *Hamden &c. Ins. Co.* (11 *Clifford, U. S.* 300,) it is held by Justice Clifford that "All statements contained in the policy itself are *prima facie* warranties, while extraneous statements are regarded merely as representations, even when made formally, in writing or in answer to written or

printed questions propounded by the insurers. Such statements, when not introduced into the policy, are ordinarily regarded as collateral to the contract, but they may undoubtedly be incorporated with it by agreement, and then they cease to be representations, and become warranties." This we understand to be a correct statement of the law on the subject. What representations, then, can it be claimed were contained in this policy, or incorporated in it by agreement? The only portions of the policy which bear upon the question under consideration are as follows: In the commencement of the policy it is stated to be made by the company, "in consideration of the representations made to them in the application for the same, which is hereby made a part of this policy, and of the sum," &c. On a subsequent part of the policy it is further said: "And it is also understood and agreed by the within assured, to be the true intent and meaning hereof, that if the representations made *in the application* for this policy, and upon the faith of which this policy is issued, shall be found in any respect untrue, then and in such case this policy shall be null and void." These provisions clearly make the application a part of the policy itself; and the representations in the answers to the questions contained in it, warranties. What, then, is the "application" which is referred to in the policy? We think the justice at the circuit correctly held that it was the paper headed "Application for policy No. 21,938," and which contains a series of questions intended to be addressed to the person whose life is proposed to be insured, probably also including the paper attached thereto and headed, "Questions to be answered by the party for whose benefit the insurance is desired." These, we think, are the only papers which can be fairly considered to constitute the application, although in practice in this case there was also attached to the same papers another printed paper with the heading, "Questions to

be answered by the medical examiner for the company." We think the latter cannot reasonably be considered to be the application, or part of the application. It commences with what is intended as a direct communication from the company to its medical examiner, stating the importance of his duties and urging in behalf of the company the exercise of vigilance and scrutiny in the examination, and stating that the examiner will be paid whether he recommends or rejects the case; and what seems to be conclusive, is that the very first question addressed to the medical examiner is, "1. Have you the application before you filled up?" which is answered, "Yes." Now, this would be an absurd and impossible question if the very document which it was expected the medical examiner would then commence to fill up was the application or a part of the application. Besides this, it is quite apparent that as to many of the questions proposed to the medical examiner, the applicant could not know, and could not be supposed to know, whether they were truly answered or not; such as the regularity of the sounds and rhythm of the heart, &c. We are of opinion, therefore, that the statements made by Mulliner to Dr. Mandeville, were not warranties, within the meaning of the policy. The counsel for the plaintiff claims that no misrepresentation made by the assured at the time of procuring a policy, and which is not an express warranty, can avoid the policy unless it was wilfully false, and fraudulently made. And the language of some of the judges in the two recent English cases to which he refers certainly countenances the idea that such were the views entertained by them. The most important of these cases, that of *Wheelton* v. *Hardisty*, (8 *Ellis & Blackburn*, 237,) arose upon a plea. In that case a policy had been issued for the benefit of certain creditors, upon the life of one Jodrell, in fact based upon statements made by other parties, and upon an application to another com-

pany, which statements the applicants for the policy in question had certified to be true according to their belief. This qualification as to belief not, however, appearing upon the record, certain pleas imputing fraud to the assured had been negatived by the jury. The fourth plea, however, was simply of the representation and its falsity. The representation as set up in the plea, was, that Jodrell had not had any fit or convulsion since childhood, and "had not any disease of the lungs or heart, or any other disease or disorder tending to the shortening of life." And the plea negatived the truth of these representations by averring that Jodrell had had epileptic fits since childhood, and had the delirium tremens. The jury found the fourth plea to be true, but the plaintiff moved for judgment notwithstanding the verdict. This motion was denied, in the Queen's Bench, which held the representation a warranty. But the decision was reversed in the Exchequer, which ordered judgment for the plaintiff, notwithstanding the verdict on the fourth plea, holding that the statement was not, under the provision of the policy, a warranty by the assured, but was a mere representation. It appears quite probable that the real ground upon which the allegation of the plea was held in the Exchequer to be no bar, was because it did not contain any direct averment of the materiality of the representation. Martin, B., says: "So that there is nothing to show that the defendants were really injured by the fact of the representation being untrue." And Bramwell, B., said: "The plea is bad because the existence of the fact it traverses is immaterial." In the other case, *Anderson* v. *Fitzgerald*, (4 *House of Lords*, 484,) the court below had instructed the jury in a case held to be a warranty, that the representation alleged to be false must also be material, in order to defeat the policy. The decision below was reversed in the House of Lords, on the opinion of the twelve judges. The remarks of the lord chan-

cellor in that case, if they are to be understood as asserting that a material representation not a warranty, in order to avoid the policy, must not only be false but wilfully and knowingly false, were *obiter* in the case. Other English cases as well as the whole current of decision in this country, and the uniform teachings of the elementary writers upon the law of insurance, seem to settle the question beyond the power of this court to depart from the recognized rule. In *Alston* v. *The Mechanics' Mutual Insurance Co.* in the Court of Errors, (4 *Hill*, 329,) the chancellor, after a careful examination of the rule upon this question laid down by numerous text writers, both American and foreign, says: "I find them concur in saying that a misrepresentation in reference to insurance contracts is a false affirmation as to some facts material to the risk, which affirmation is made by the assured or his agent, either from a mistake as to the fact represented, or with a design to deceive the insurer." He had before laid down the same doctrine, also· in the Court of Errors, in *The Farmers' Ins. and Loan Co.* v. *Snyder* (16 *Wend.* 481,) Chancellor Kent (3 *Kent's Com.* 283) speaks of two kinds of misrepresentations. Those which are intentional and avoid the contract for actual fraud on the part of the assured or his agents, and those which arise from mistake or oversight, which do not affect the policy unless they are untrue in substance and material to the risk. The statements of the elementary writers may be found collected in the opinion of the chancellor in *Alston* v. *The Mechanics' Mutual Ins. Co.*, *supra.* (*See also Wall* v. *Howard Ins. Co.*, 14 *Barb.* 383 ; *Mutual Life Ins. Co.* v. *Wager*, 27 *Barb.* 354 ; *Campbell* v. *New England &c. Ins. Co.*, 98 *Mass.* 301.) A representation differs from a positive warranty only in this, that with respect to the latter the materiality or immateriality of the facts included in it is unimportant ; with respect to the former the insurance is not void unless the fact misrep-

resented is material. (*Angell on Life Ins.* § 318:) We must hold the law, therefore, to be that where the statement is a warranty it must be actually true, and whether material or not, its falsity avoids the policy. The falsity, however, of a collateral representation not expressly warranted by the contract will not avoid the policy unless it is material to the risk. But if false in substance, and material to the risk, there can be no liability upon the policy, however innocently the misrepresentation may have been made.

From the foregoing views it results that the request to charge was properly denied, if for no other reason, because it lacked the necessary qualification that the statement must be material. The materiality of the representation was a question for the jury, (*Campbell* v. *New England &c. Ins. Co.*, *supra ;*) and to have instructed the jury according to the request, without qualification, would have been erroneous.

That portion of the charge excepted to referred to the representation alleged in the answer to have been "that the functions of his brain, his muscular and nervous system, were in a healthy state." The court said : "I charge you that the gist of the allegation in this respect against George Mulliner, is fraud on his part," &c. This allegation referred to was the allegation of the answer, and was entirely correct, as the answer is to be understood as distinctly averring a wilful falsehood in this respect, though in an argumentative form. The representation not being a warranty, the only remaining allegation is one of fraud. After the cause had been tried on this issue the defendant was bound by it, as the plaintiff may have contented himself with evidence sufficient to satisfy the jury that Mulliner practised no wilful deception in the matter. But if the charge had been erroneous, it was immaterial, for the reason before stated, that there was no sufficient evidence in the case of any functional disease of the brain. And for the

further reason, that an incorrect statement by the applicant in answer to a question by the examining physician will not be deemed such a misrepresentation as to avoid the policy, when it appears that the physician's report as to the applicant's condition, and not the statements of the applicant himself, was relied on by the company. (*Hogle* v. *Guardian Life Ins. Co.*, 4 *Abb. N. S.* 346; *S. C.*, 6 *Rob.* 567.) It is obvious that as to a question of this character the company must rely upon the statement of the medical examiner. What Mulliner actually did say was not reported to the company, but the physician made his own answer, not only from the information contained in Mulliner's statements, but from a personal and careful examination of the physical system of the applicant.

On the whole, then, we are of the opinion that the exceptions to which our attention has been called in this case present no error which calls upon us to direct a new trial.

A new trial is denied, and judgment ordered for the plaintiff on the verdict.

Judgment for the plaintiff.

[FOURTH DEPARTMENT, GENERAL TERM, at Buffalo, January 7, 1873. *Mullin*, and *Talcott*, Justices.]